**MINNESOTA MINING AND MANUFACTURING COMPANY, Plaintiff,**

v.

**NORTON COMPANY, Studebaker-Packard Corporation, Hadco Corporation, Defendants.**

No. 37154.

United States District Court
N. D. Ohio, E. D.

March 10, 1965.

Findings of Fact and Conclusions of Law March 29, 1965.

See also, 36 F.R.D. 1.

Thomas V. Koykka, Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, for plaintiff, Harold J. Kinney, Stanley G. DeLaHunt, Richard E. Brink, Carpenter, Abbott, Coulter & Kinney, St. Paul, Minn., of counsel.

George H. Rudolph, Jones, Day, Cockley & Reavis, Cleveland, Ohio, for defendant, John W. Malley, Allen Kirkpatrick, Cushman, Darby & Cushman, Washington, D. C., of counsel.

Hugh E. Smith, Troy, N. Y., for defendant Norton Co.

CONNELL, Chief Judge.

The history of this patent begins on February 21, 1957, when the plaintiff filed in the United States Patent Office an application which became Serial No. 641714. On October 8, 1958, the plaintiff filed an application for patent in the names of its employees Howard L. Hoover, Eugene J. Dupre and Walter J. Rankin, Application No. 777,167, which application contained matter related to a certain extent to the subject matter of the earlier application, but which contained certain substantial additional subject matter. In the month of January 1959, less than six months after the filing of Application 777,167, the plaintiff caused to be filed Applications for Patent in five foreign countries which applications involved substantially the same subject matter. Application was made in Sweden on January 19, 1959, in Australia on January 20, 1959, in Argentina and Italy on January 22, 1959, and in Japan on January 24, 1959. On January 12th of 1959 the United States Patent Office received from a Chicago law firm (Langner, Perry, Carr & Langner) a request for a license for the filing of foreign applications based on U. S. Application 777,167. Thus, from the stipulated facts before us, it is apparent that the plaintiff did not await the arrival of the license before filing in these five foreign countries. On February 9, 1959, the Patent Office issued a license dated February 5, 1959, which stated that the license was not retroactive.

On January 4, 1965 this Court conducted an oral hearing on the defendants' motion for summary judgment. At that time the defendants pointed out that the plaintiff had violated the provisions of

Title 35, §§ 184 and 185 because they had failed to obtain a license from the Patent Office to file applications in foreign countries. On the authority of Beckman Instruments, Inc. v. Coleman Instruments, Inc., 338 F.2d 573, (7th Cir. 1964), we concluded that the six month waiting period described in § 184 begins to run from the date of filing of a "Continuation-in-Part" application; that the plaintiff, by filing in five foreign countries in January of 1959 without a license to do so, had thus violated the statute, and under the explicit language of § 185 the patent was necessarily invalid.

Subsequent to the Court's decision, present counsel for Minnesota Mining Company was successful in securing a retroactive license from the Patent Office, which purports to issue a license retroactive to January 8, 1959 with respect to Argentina, Australia, Italy, Japan and Sweden. Had this license been secured prior to the issuance of the patent, there is no doubt that it would have cured the infirmity created by the precocious filing in these foreign countries. The problem with which we are here faced is the present effect of a retroactive license upon a patent which has already issued from the Patent Office. Our question ultimately is one of jurisdiction, i. e., whether the Patent Office has the power to breathe life into an otherwise meaningless piece of paper.

█ Cases are filled with statements that "The only authority competent to set a patent aside, or to annul it, or to correct it for any reason whatever, is vested in the courts of the United States and not in the department which issued the patent." McCormick Harvesting Machine Co. v. Aultman, 169 U.S. 606, 609, 18 S.Ct. 443, 42 L.Ed. 875 (1898). However, under Article I, § 8 of the Constitution [1], the power to confer jurisdiction ultimately resides in Congress. Congress outlines the function of the Patent Office and divides responsibilities between the administrative and judicial bodies. In arranging the division of duties, Congress has accorded the Patent Office some limited areas of jurisdiction where it can control or affect patents after their issuance. But, except for those specifically defined instances where a commissioner may reach out to assert his authority over an already issued patent, we think that he is precluded from doing so. As stated in McCrady, Patent Office Practices, 422, 4th Ed. 1959: "Issuance of a patent puts it *beyond the control of the Office* except for interference (§ 249 hereof), reissue (Chap XXIV), Office reissue (§ 303), statutory disclaimer (§§ 298–301), certification of correction (§ 302)."

Plaintiff has directed our attention to six cases [2] in which courts have in effect recognized the propriety of congressional acts which vest in the commissioner discretionary power over a patent even after it has issued from the Patent Office. With this we have no quarrel. These cases have three recurring characteristics: (1) the discretionary authority of the Patent Office is explicitly created by statute; (2) these courts by expressing a reluctance to intrude upon the Patent Office's jurisdiction, recognize the clear lines of jurisdiction drawn by Congress; and (3) these courts confined the authority of the Patent Office to the express limits found in the statute. (Cf. especially Terry v. Webster, 12 F.2d 139, 140, 56 App.D.C. 198 (D.C.Cir.1926), where the court was quick to quash an attempt by the Commissioner to enlarge the ambit of his authority.)

---

1. "Congress shall have Power * * * [t]o promote the Progress of Science and useful Arts by securing for limited Time to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

2. Seymour v. Osborne, 11 Wall. 516, 78 U.S. 516, 20 L.Ed. 33, (1870); Cregier v. Coe, 67 F.2d 692, 62 App.D.C. 320 (D.C. Cir.1933); Martin v. Robertson, 39 F. 2d 520, 59 App.D.C. 270 (D.C.Cir.1930); Terry v. Webster, 12 F.2d 139, 56 App. D.C. 198 (D.C.Cir.1926); Wayne Mfg. Co. v. Coffield Motor Washer Co., 227 F. 987, 142 C.C.A. 445 (8th Cir. 1915).

But this statute (§ 184) does not specifically provide for a grant of a retroactive license which can cure a patent which, by the mandatory language of the next section (§ 185), must be deemed invalid from its issuance. It is one thing for Congress to prescribe a method for forgiving an inadvertence within the range of the administrative process; it is quite another to endow the Patent Office with the power to invade the traditional area of the judiciary. For that is precisely what the plaintiff contends here, namely, that the Patent Office may declare an invalid patent to be a valid one by issuing a retroactive license to avoid the sanctions of § 185. The plaintiff contends that the power to issue an effective retroactive license after the patent has issued must necessarily be inferred from the language and history of the statutes in question.

Since it appears that this is a case of first impression, it will be useful to explore the legislative history of these sections and their predecessors. In the light of that history we shall appraise the import of In re Lee & Heineman, 77 USPQ 659 (1948), a case in which, on operative facts nearly identical to those now before us, the issue which we must face was resolved in favor of the patent holders.

The necessity of temporarily withholding domestic inventions from foreign exposure first became apparent during World War I when the Act of October 6, 1917, ch. 95, 40 Stat. 394 was passed. This statute contained the proviso that a United States inventor could file a patent application abroad only with the "consent or approval of the Commissioner of Patents, or under a license of the Secretary of Commerce as provided by law." With the advent of World ·War II came similar statutes (Act of July 1, 1940, ch. 501, 54 Stat. 710, amended by the Act of August 21, 1941, ch. 393, 55 Stat. 657, and further amended by the Act of June 16, 1942, ch. 415, 56 Stat. 370), which provided that—

"No person shall file * * * in any foreign country an application for patent * * * in respect of any invention made in the United States, except when authorized in each case by a license obtained from the Commissioner of Patents * *. [A]ny person * * * shall be debarred from receiving a United States patent for an invention if such person * * * without procuring the authorization prescribed * * * made or consented to or assisted another's making application in a foreign country for a patent * * * where authorization for such application is required by the provisions of section 3, and any such United States patent actually issued to any such person, successors, assigns, or legal representatives so debarred or becoming debarred shall be invalid."

Under this statute there was no provision for a retroactive license; an unlicensed foreign filing either prevented issuance or, if the patent had issued, invalidated it. When this statute expired, the so-called Boykin Act (Act of August 8, 1946, P.L. 690, 79th Cong. 2d Sess. ch. 910, 60 Stat. 940) was passed. This legislation, a temporary postwar bill, provided for similar restrictions in regard to foreign filing and similar penalties for disregard of those restrictions. The act did provide, however, (§ 6):

"Notwithstanding the provisions of the Act of Congress approved July 1, 1940 (54 Stat. 710; U.S.C., title 35, sec. 42), as amended by the Act approved August 21, 1941 (55 Stat. 657; U.S.C., title 35, secs. 42a–42f), and as further amended by the Act of June 16, 1942 (56 Stat. 570) no person shall be debarred from receiving a patent for an invention made in the United States, nor shall any patent issued for such invention be deemed or held invalid under said Act, merely because authorization to file an application for patent for such invention in any country foreign to the United States was not first obtained from the Commissioner of Patents: *Provided*, That the Commissioner subsequently au-

thorized the filing of the application in such foreign country." (60 Stat. 943.)

The House Committee on Patents explains the reason for this hitherto unknown procedure, and other innovations in the bill, in H.R. 1498, Jan 28, 1946, U.S.Code Cong.Service 1946, p. 1491. Prefatory remarks therein explain the general purpose of the bill:

"Certain objects of the bill are to relieve inventors of some of the hardships occasioned by the war in connection with the filing and the prosecution of applications for patent. Under any patent law it is necessary that times be fixed within which certain acts must be done, such as filing the application, the taking of various steps in its prosecution, the payment of fees, etc. Failure to act within the times so specified usually results in loss or forfeiture of the right to a patent. These time limitations are quite fair and just, since their general object is promptness in the issue of patents. However, such provisions frequently result in hardship during time of war, because fulfillment of the requirements is often difficult. Delays caused by the war were particularly evident in dealings with other countries, due to the uncertainty of communication, and the fact that in many instances communication was forbidden or controlled."

In reference to the particular section of concern here, the Committee stated that:

"Patents have been granted on applications corresponding to foreign applications which were inadvertently filed by the applicants without first obtaining a license from the Commissioner of Patents as required by the act of July 1, 1940 (54 Stat. 710; U.S.C., title 35, sec. 42), as amended. In such cases where the foreign application was filed in countries allied with the United States during the war, the Commissioner subsequently issued a license. Section 6 of the bill would validate the patents in cases where such licenses were granted."

In this context, then, this extension of the Patent Office's jurisdiction, while unusual, was nevertheless a product of exigency necessary to facilitate postwar recovery without working unjust results on inventors hampered by war-time communication problems.

It was under the authority of this statute that the Commissioner decided In re Lee & Heineman, supra. In that case the patentees had inadvertently, and without the required license, filed for and received a patent in Canada on an invention which corresponded to United States Patent 271,245. Some three years after the issuance of the domestic patent, the patentees petitioned for and received a retroactive license under Section 6, which cured their negligent violation of Section 3. But even there the Commissioner recognized "that the authority of the Commissioner to grant licenses will expire with the expiration of Section 3 of the Act of August 21, 1941, at the end of the war." (at p. 660). These sections were omitted in the revision contained in the Act of July 19, 1952, ch. 950, 66 Stat. 792, and thus repealed. The omission of the extraordinary power which Section 6 granted to the Commissioner—to cure a defective patent after it had run its administrative course—is highly significant. That statute no longer exists because the situation at which it was aimed no longer exists.

We come finally to a confrontation with the present section, 35 U.S.C.A. § 184, which has been in effect since that revision in 1952. The plaintiff argues that it contains a savings clause which empowers the Patent Office to save its invalid patent.

"Except when authorized by a license obtained from the Commissioner a person shall not file or cause or authorize to be filed in any foreign country prior to six months after the filing in the United States

an application for patent or for the registration of a utility model, industrial design, or model in respect of an invention made in this country. A license shall not be granted with respect to an invention subject to an order issued by the Commissioner pursuant to section 181 of this title without the concurrence of the head of the departments and the chief officers of the agencies who caused the order to be issued. *The license may be granted retroactively where an application has been inadvertently filed abroad and the application* [4] *does not disclose an invention within the scope of section 181 of this title.* (Emphasis added)

"The term 'application' when used in this chapter includes applications and any modifications, amendments, or supplements thereto, or divisions thereof. July 19, 1952, c. 950, § 1, 66 Stat. 807."

As we stated previously, on January 4, 1965, the mandatory language of this section is clear and its meaning is unmistakable. It fulfills the aim of Congress as expressed in the Committee Reports to permit the Government, not the individual, to determine whether the national interest might be impaired by the filing in a foreign country of an application for patent over a domestic invention and, as the Committee states, the bill changes "the temporary act of Congress now in force into permanent law, *with several changes recognized as desirable as a result of experience under the temporary law and problems anticipated under a permanent law.*" (82nd Cong. 1st Sess.H.R. 828, Sept. 24, 1951, p. 4) (Emphasis added). We must conclude that one of the changes is divestiture from the Patent Office of the power to grant a retroactive license to cure patents which were invalid upon issuance because of violations of Section 184.

Whatever doubt there may be on this issue is resolved by the resounding language of Section 185, the sanctioning provision in this chapter:

*"Notwithstanding any other provisions of law* any person, and his successors, assigns, or legal representatives, *shall not receive* a United States patent for an invention if that person, or his successors, assigns, or legal representatives shall, without procuring the license prescribed in section 184 of this title, have made, or consented to or assisted another's making, application in a foreign country for a patent or for the registration of a utility model, industrial design, or model in respect of the invention. A United States patent issued to such person, his successors, assigns, or legal representatives *shall be invalid.* July 19, 1952, c. 950, § 1, 66 Stat. 807." (Emphasis added)

The plain fact here is that the patent did issue without a license and must be deemed invalid *ab initio.* Without specific authorization from Congress, the Commissioner is powerless to affect the validity or invalidity of a patent after it has egressed from administrative channels. Consequently, the purported retroactive license issued on January 8, 1965 is inoperative, and the plaintiff's Motion for Reconsideration of the Court's Order of January 4, 1965 must be overruled. It is so ordered.

FINDINGS OF FACT

1. The Plaintiff is the owner of U. S. Patent No. 2,958,593 in suit, which patent was granted November 1, 1960, on U. S. application Serial No. 1453, filed January 11, 1960. This application

---

4. We note that the very clause upon which the plaintiff relies here permits a retroactive license to issue only when the *application* discloses no harmful information; if Congress had intended to extend the Patent Office jurisdiction beyond its normal administrative reaches, it would have included the phrase "or patent" after "application." This would have opened the way for the action attempted here by the plaintiff. Without the inclusion of such language, however, we detect nothing here which permits the Patent Office to assert itself over an application which has already ripened into a purported patent.

Serial No. 1453 was a continuation-in-part of earlier application Serial No. 777,167 and of still earlier application Serial No. 641,714.

2. Plaintiff did on October 8, 1958, file in the U. S. Patent Office an application for patent in the names of its employees Howard L. Hoover, Eugene J. Dupre and Walter J. Rankin. The application was given Serial No. 777,167.

3. Less than six months after said filing of Serial No. 777,167, Plaintiff caused to be filed in five foreign countries five patent applications based upon a copy of said Serial No. 777,167, these being:

| Country | Application Serial No. | Filed On | Patent No. |
|---------|------------------------|----------|------------|
| Argentina | 153,295 | 1/22/59 | 125,791 |
| Australia | 45,148/59 | 1/20/59 | 230,115 |
| Italy | 28/71 | 1/22/59 | 602,697 |
| Japan | 1,698/58 | 1/24/59 | 311,875 |
| Sweden | 457/59 | 1/19/59 | 187,528 |

4. U. S. application Serial No. 777,-167 and the Australian Serial No. 45,148/59 are substantially copies of one another, practically all of the text being verbatim copy.

5. The U. S. Patent Office on January 12, 1959, received from a law firm representing the Plaintiff herein a request for license for foreign filing of Plaintiff's applications based on U. S. Serial No. 777,167.

6. The aforesaid law firm representing Plaintiff did not receive until February 9, 1959, a license for foreign filings, which license was dated February 5, 1959, No. 250,351. This license states: "This license is not retroactive unless specifically indicated.", and the license contains no indication of any retroactive effect.

7. On February 21, 1957, Plaintiff did file in the U. S. Patent Office an application for patent, Serial No. 641,714, which was related to a certain extent to the subject matter of Serial No. 777,167, which was a continuation-in-part thereof. However, Serial No. 641,714 did not contain certain substantial additional disclosure introducing new subject matter, which new matter is in both the Australian application and U. S. Serial No. 777,167. Without doubt, the second application was a modification, amendment or supplement to the first.

8. On January 11, 1960, Plaintiff did file still a third U. S. application Serial No. 1453 which included all of the disclosure of the second U. S. application Serial No. 777,167, but added still further subject matter. The patent in suit, U. S. Patent 2,958,593, was granted on U. S. application Serial No. 1453.

9. Subsequent to the issuance of its patent, Plaintiff applied for and received from the Patent Office in respect to its second application Serial No. 777,167, a license for foreign filing, No. 288,850, dated January 8, 1965, which purported to be retroactive to January 8, 1959.

10. The purported inventive activities of Hoover, Dupre and Rankin occurred in the United States, as shown by the depositions of these persons, the transcripts of which are on file in this Court.

## CONCLUSIONS OF LAW

1. This action arises under the Patent Laws of the United States, and this Court has jurisdiction over the subject matter and of the parties hereto.

2. The provisions of 35 U.S.C. §§ 184 and 185 are clear and unambiguously expressed, and provide that when an applicant for U. S. patent has filed, or caused or authorized to be filed in a foreign country a corresponding application without first having obtained the li-

cense required under 35 U.S.C. § 184, a U. S. patent granted on the U. S. application is invalid under 35 U.S.C. § 185 when issued.

3. These statutory provisions, 35 U.S.C. §§ 184 and 185, apply to any and all United States patent applications.

4. Failure to comply with 35 U.S.C. § 184 before receiving the patent causes Plaintiff's Hoover et al. Patent 2,958,593 in suit to be invalid under the provisions of 35 U.S.C. § 185, and it has been invalid from the date of its issuance.

5. After a patent has issued, the Patent Office is without power to grant a retroactive license which purports to ratify an application for patent filed in a foreign country in violation of Title 35, Section 184.

6. The purported retroactive license No. 288,850, dated January 8, 1965, has no legal effect.

7. Inasmuch as the Hoover, et al. patent issued without a license for foreign filing, and foreign applications were filed within the six-month period of proscription, the patent is declared invalid *ab initio,* and the complaint herein is dismissed with prejudice.